GEORGE F. ROOKE *et al. vs.* MAX L. GRANT *et al.*

NOVEMBER 21, 1950.

PRESENT: Flynn, C. J., Capotosto, Baker, Condon and O'Connell, JJ.

CAPOTOSTO, J. This is a bill in equity to establish a constructive trust and for an accounting. It was heard in the superior court on bill and answer in the nature of a cross bill.

Following hearings over an extended period of time the trial justice denied and dismissed the bill and a decree to that effect was thereafter duly entered. The cause is before us on complainants' appeal from the entry of that decree.

The complainants George F. Rooke and Jennie L. Rooke are husband and wife, hereinafter frequently referred to as the Rookes. They instituted these proceedings on behalf of themselves and "other stockholders of the Money-Meters, Inc., a corporation organized under the laws of the State of Michigan, who may appear herein and pay their proportionate part of the expense and costs hereof * * *." No other stockholder joined with the Rookes. Confusion will be avoided by keeping in mind that Money-Meters, Inc. of Michigan is not the respondent "Money-Meters, Inc.," a corporation organized under the laws of the state of Rhode Island. In the course of this opinion we will refer to the former merely as "Money Meters" and to the latter as "Money Meters of Rhode Island."

The real respondent in this cause is Max L. Grant, individually and doing business as Mary Investment Company. The respondents Louis Meisel, Charles C. Brown, Gardner Investment Company, and Money-Meters, Inc. of Rhode Island are admittedly agents or agencies of Grant. The other respondents are Coin-Meters, Inc., hereinafter called Coin Meters, and Leonard Valve Company.

It is impossible to set out with any degree of particularity and within reasonable limits either the many allegations of the bill and of the answer in the nature of a cross bill, or the evidence in support thereof which comprises 3,772 pages of testimony and 368 exhibits. In the circumstances we must necessarily confine ourselves to a mere outline of the pleadings and to a summary in general terms of the evidence, which we have examined with the assistance of extensive briefs from the parties.

The bill sets out in great detail complainants' financial dealings with Grant over many years with special reference to the period from September 1936 to the bringing of this

suit in July 1943. The various transactions between the parties and the consequences thereof during the period from 1936 to 1943 concerned mainly the management and attempted rehabilitation of Money Meters, a corporation which the Rookes controlled as stockholders, officers and directors, and also of the Providence Manufacturing and Tool Company, hereinafter called Providence Tool, the trade name of an unincorporated business concern originally owned by the complainant George L. Rooke personally, which company, in the course of the dealings under consideration, was incorporated as Coin Meters. The gravamen of complainants' allegations is that Grant, who had knowledge of the precarious financial situation of the above-named corporation and company, "solicited" the complainants to give him their "complete confidence," representing to them that if they "would put their trust in him, he [Grant] would protect the assets and business of their concerns and of them personally * * *"; that by such solicitations he won complainants' confidence to the extent that on September 23, 1936 they entered into an agreement with him whereby they gave Grant "exclusive control in the management of their said enterprises" for the above-mentioned purposes.

On the basis of such fundamental allegations the bill then proceeds to describe complainants' subsequent business dealings with Grant in relation to the affairs of the two corporations and his ultimate alleged conversion of complainants' interests therein to his own personal benefit and advantage. The main prayer of the bill is that Grant and the other respondents as his agents be held as constructive trustees for the Rookes of all properties and moneys that came into their respective hands and possession by reason of such dealings, and that they be required to give an accounting thereof.

Respondents' answer in the nature of a cross bill specifically denies each and every allegation of the bill with reference to complainants' claim that Grant induced or

solicited them to do business with him in the manner about which they now complain. The answer, like the bill, sets out fully from Grant's viewpoint the business relations between the parties for over twenty years. The substance of the answer is that Grant always dealt with the complainants on a strictly business basis and for profit, without any solicitation or inducement on his part; that for some time prior to 1936 he had refused to lend the Rookes any more money; that in September of that year they personally and through others besought him to assist them as a matter of business in their extreme financial predicament, they and their various enterprises, especially Money Meters, then being on the brink of disaster; that he finally yielded to such entreaties and after a preliminary examination entered into the agreement of September 23, 1936; and that, except for an addition to that agreement on September 24, the complainants were thereafter always represented by counsel. In other words the basic theme of the answer is that the Rookes, well knowing Grant's mode of doing business, voluntarily agreed to give him not only full and unusual compensation for his anticipated substantial investment in most unfavorable circumstances but also to pay him for the time, experience and efforts that he would be called upon to expend in the matter.

As with the pleadings, we will now outline the evidence in general language except in rare instances. It appears that by 1936 the Rookes were not novices in business matters, including the promotion, development and management of corporations organized by them. There is also evidence showing that they were inclined to take long chances in investments of various kinds and that they did not hesitate to use the funds of one of their corporations or ventures for the benefit of another whenever they deemed it convenient for their own personal interests. On the other hand the evidence shows Grant as a conservative investor and moneylender who, carrying on his business mainly through agents and corporate agencies.

exacted both security and extraordinary compensation from those who came to him for his money or services.

It further appears that the Rookes and Grant had numerous dealings with each other in money matters for many years before the agreement, which is at the root of this cause, was signed in September 1936. We need not refer to such prior dealings as they have no material bearing on the issue now before us. However, by 1936 the Rookes personally and most of their enterprises, especially Money Meters and Providence Tool, had become involved in serious and pressing financial difficulties. It was in such circumstances that they turned to Grant and besought his assistance in extricating them from their precarious situation.

In September 1936 Money Meters, the successor to the Rooke Automatic Register Company of Maine, manufactured automatic coin registering machines. As far as we have been able to ascertain from a mass of details it appears that at that time the Rookes and Walter A. Williamson, Mrs. Rooke's brother, who were the only officers and directors of Money Meters, held approximately 80 per cent of the stock of that corporation, the remaining 20 per cent being in the hands of some seventy or more other stockholders. For reasons that will hereinafter appear the name "Money-Meters, Inc." was subsequently adopted by a Rhode Island corporation, a respondent in this cause.

For some years prior to 1936 George F. Rooke, doing business as Providence Tool in Providence, made parts for or repaired the automatic coin registering machines which were put on the market by Money Meters. In October 1936 Providence Tool was incorporated in Rhode Island as Coin Meters. The corporation then issued 600 shares of stock, 360 of which went to the Gardner Investment Company, an agency of Grant, and 240 shares to Mrs. Rooke, who became one of its directors.

We will now by summary endeavor to give a general idea of the dealings between the parties and the occurrences connected therewith from September 1936 to the bringing

of these proceedings in 1943. It clearly appears that the Rookes first sought Grant's assistance by mail without success; that a niece of theirs then interceded in their behalf; and that finally, borrowing money from Grant for traveling expenses, they were prepared to come from Detroit to Providence to discuss the situation with him but were prevented from doing so because of threatened action against Money Meters and them personally by creditors in Michigan. Grant thereupon went to Detroit to investigate the matter and determine for himself whether and on what terms he would deal with them. Following such investigation the parties, on September 23, 1936, reached a tentative agreement in that city where, after it was dictated to a public stenographer by Grant in cooperation with the Rookes, it was signed by all concerned.

The substance of such agreement was that Grant would use his business experience and money "to prevent a total collapse of the Money Meters Corporation * * * so that the stockholders of Money Meters, Inc. be freed from the threats and menaces that are now facing them," as shown in the financial statement of that corporation dated July 31, 1936; that for his investment and services the Rookes were to transfer to Grant in his own right 60 per cent of the stock of Money Meters; that the management and control of the affairs of that corporation and of Providence Tool, which was thereafter incorporated as Coin Meters, was to vest solely in Grant with authority in him to make settlements when and how he deemed advisable; and that the Rookes would cause Money Meters and Providence Tool to do all things necessary to carry out the provisions of the agreement "immediately upon the request" of Grant.

Between September 23 and October 7, 1936 each party retained counsel in the matter. During that period the Rookes did not change their position in any way, while Grant, who had demanded and purportedly received from them an accurate list of all creditors of Money Meters, expended considerable time and money in connection with

the affairs of that corporation. With his own personal funds he bought or secured options to buy all outstanding claims against Money Meters disclosed to him by the Rookes; and further, among other things, forestalled impending suits of a substantial nature by the United States collector of internal revenue in Detroit against that corporation and the Rookes.

On October 7, 1936 at a meeting of the parties in Detroit at the office of William Friedman, Grant's attorney, the Rookes were represented by attorney Joel Prescott, who acted in their behalf in all conferences on that and the following day. The result of those meetings was that the agreement of September 23 was approved with additional commitments by both parties. Friedman was then instructed to prepare the necessary papers for execution on the next day, October 9. Shortly after the Rookes and Prescott had left Friedman's office, Prescott notified Friedman by telephone that he no longer represented the Rookes. On October 9 the Rookes came to Friedman's office with Robert Plunkett as their attorney. Following an investigation of the matter by Plunkett to his satisfaction and after consultation with his clients, the Rookes executed the documents that Friedman had prepared.

We observe here that Walter A. Williamson, the only other director of Money Meters, was present at that meeting and concurred in the proceedings that then took place. Furthermore, although Friedman testified at length by deposition as to what happened at his office on October 7, 8 and 9, there was no testimony in any form from either Prescott or Plunkett. It also appears that although counsel for the Rookes asked for and received permission to take the deposition of Plunkett none was ever taken.

Upon completion of the transaction in the manner above outlined Grant held 60 per cent of the shares of Money Meters and 360 shares of Coin Meters, formerly Providence Tool; the Rookes held about 20 per cent of the remaining shares of the former corporation, and Mrs. Rooke held

240 shares of the latter corporation. It also appears that by resolution dated October 9, 1936 the directors of Money Meters, namely, the Rookes and Williamson, voted to employ Grant as general manager of that corporation for one year with exclusive and unrestricted power to operate and manage its affairs in the manner deemed most advisable by him. On the other hand Grant, on the same date, gave to the Rookes a sixty-day option providing that in the event of his death within three months of October 9 they might buy his shares in the two corporations upon the payment of all moneys expended by him up to that time plus $10,000.

Among other matters decided at the conferences of October 7, 8 and 9, 1936 and subsequently carried out by Grant were: (1) the retention of Mr. Rooke as an employee of Money Meters at a salary of $100 a week; (2) the furnishing of funds by Grant to the Rookes so that they might pay pressing personal obligations, such as premiums on life insurance policies and accumulated charges for the storage of furniture; (3) the providing of funds to Coin Meters for its immediate needs so that it might continue in operation; and (4) the ultimate settlement by Grant for the Rookes of the latter's serious involvement in the affairs of the Johnson Fare Box Company whereby together with other benefits the Rookes were released from the payment of a promissory note in a very substantial amount.

We can only outline the conflicting evidence relating to the different interlocking events that followed October 9, 1936. Expressed in the most general terms it may be said that such events had their origin in the failure by the Rookes to include in the list of creditors of Money Meters which they gave to Grant prior to October 9 the claim of Hammond and Nichols in the sum of over $22,000, and more particularly the nondisclosure by the Rookes that the charter of Money Meters had been voided by the state of Michigan since about 1935 for nonpayment of taxes. Grant

testified that when, in the latter part of October 1936, he learned of such nondisclosures to him by the Rookes, he immediately notified them to seek and thereafter follow the advice of personal counsel. Thereupon the Rookes referred the matter of the charter to their personal attorneys, who advised them that in the circumstances Money Meters should wind up its affairs by sale of its assets as otherwise the directors would be subject to personal liability in case of loss on any new business.

Acting upon such advice and with Grant's knowledge the Rookes put the assets of Money Meters on the market for sale. Following their rejection of an offer of $5,000 from one Lund, they asked Grant to buy those assets. In answer to that request Grant made an offer of $7,000 which the Rookes, on the advice of their counsel in Providence, also rejected as too low. In Grant's testimony it appears that Money Meters was then bound to give free service to the extent of over $20,000 to various customers, as the Rookes had already discounted those accounts. There is also evidence that the corporation then owed about $25,000 to the federal government and some $5,000 to the states of Michigan and Rhode Island for accrued taxes.

In the circumstances Grant, after notifying the Rookes that thenceforth he would act independently, secured a charter in Rhode Island for "Money-Meters, Inc." in order to preserve that name, and he also instituted proceedings in the superior court for the appointment of a receiver to take over the assets of Money Meters in this state. Since the Rookes failed to answer such proceedings a receiver was appointed. Thereafter a creditors' bill in equity naming the Rookes, Williamson and Grant as respondents was filed in Michigan for the appointment of a receiver in that state for Money Meters. That bill, which Grant answered, was dismissed as to him and a receiver was appointed.

Following such action by the Michigan court a petition under §77B of the bankruptcy act to reorganize the corpo-

ration was filed in the federal court for that district. Apparently unwilling to submit themselves to those proceedings the Rookes and Williamson, as officers and directors of Money Meters and acting through their personal attorneys in Providence, filed a petition in bankruptcy for Money Meters in the United States district court for the district of Rhode Island. The Gardner Investment Company, admittedly a Grant agency, was listed in the schedule accompanying that petition as a creditor for a sum in excess of $45,000. A motion by the Michigan receiver to vacate the adjudication of Money Meters as bankrupt and to dismiss the petition was denied.

Among the exhibits in the bankruptcy proceedings are a decision by the referee with reference to the claim of the Gardner Investment Company and the report of a special master respecting the real stockholders of and their respective holdings in Money Meters. At the instance of a creditor the trustee urged that the Gardner claim should be limited to the amount actually paid for the various assignments which that claim represented rather than the full face value thereof. After a number of hearings on that issue and an investigation of Grant's dealings with the Rookes in September and October 1936, the referee in his decision stated that no testimony had been offered to the effect that the Rookes were "to share in any profit to be made by Grant from such purchases. So far as the facts show Grant purchased the claims openly, and he was not in any way competing with the bankrupt. No facts or circumstances have been shown which show any duty which Grant owed to the bankrupt to purchase or extinguish the claim for the bankrupt." On the authorities cited, the referee, after making certain deductions on grounds not necessary to mention here, allowed the Gardner Investment Company's claim in full.

The report of the special master reviews in detail the history of Money Meters from the time that it absorbed the Rooke Automatic Register Company. In describing

the extent of his investigation he said: "I have on numerous occasions examined at great length both Mr. and Mrs. Rooke who were the moving factors in each of the corporations." The pertinent part of that report in this cause is that Grant was found to be the true owner of the stock of Money Meters which the Rookes had transferred to him in October 1936. The referee's decision and the report of the special master were both subsequently approved by the court. In December 1938 the petition of the trustee in bankruptcy to sell the assets of Money Meters was granted and they were sold to Grant or one of his agencies. We note here that the Rookes were represented by experienced counsel throughout the bankruptcy case; that they actually testified in those proceedings concerning the true owners of the stock of Money Meters and of the claims purchased by Grant; and that with full knowledge of Grant's position with reference to such items, which was clearly adverse to them and to the corporation, they never took issue with him as to those matters but apparently consented thereto by their conduct at the various hearings and by their failure to question in court the decisions of the referee and special master.

In the instant cause the trial justice denied and dismissed the bill on the ground that the complainants had failed to establish by " 'full, clear and convincing evidence, able to withstand the closest scrutiny' that a constructive trust was created for them as alleged in the Bill of Complaint." Among his findings the most pertinent are as follows. First, that in 1936 Money Meters was "on the verge of bankruptcy" with the Rookes facing possible legal proceedings in Michigan from their personal creditors and the shareholders and creditors of that corporation. Secondly, that in the circumstances Grant, taking a chance and expecting a large profit if his gamble with Money Meters was successful and to suffer no loss if it was otherwise, "drove a hard bargain with them [Rookes] to which they agreed because no other recourse was open to them." Third-

ly, that Grant expended time, effort and money in his attempt to put Money Meters on its feet until he learned that its charter had been forfeited and that all the debts of the corporation had not been reported to him, whereupon he quit in self-protection. And finally, that in the bankruptcy proceedings the Rookes made "no claim of any interest whatsoever" to the stock or assets of Money Meters "although Mrs. Rooke attended some of them and was a witness."

It is clear that the trial justice rested his decision squarely on the conflicting evidence of record. His rescript says: "Our conclusion, after considering all the evidence presented to us, is that the parties to this proceeding at all times dealt with each other on a strictly business basis * * *. We feel that such an important matter as a beneficial interest in this fare register would be surely one to have some memorandum or statement in the large correspondence between them. We find no such reference. We think that if this relation was intended to be created by the parties in the fall of 1936, the large number of good lawyers employed by the parties would see that good and sufficient record of the same would be made. There is no such record before us."

According to the parties the agreement of September 23, 1936 was not a binding contract in writing. In their main brief complainants state that the "absolute discretion to Grant in the agreement, that Grant might do nothing, if he saw fit to do nothing; renders the agreement legally unenforceable as an executory contract, because of lack of mutuality." On the other hand the respondents, relying on *Marvin* v. *Solventol Chemical Products, Inc.*, 298 Mich. 296, maintain that the agreement was invalid and illegal under the law of that state. In such a situation the only effect that can fairly be given to the agreement is to treat it as the initial material incident in a train of occurrences and circumstances which resulted in these proceedings.

Since the prayer for relief in the bill is predicated on the

existence of a fiduciary relation between the parties, complainants were bound to support that claim in accordance with our rule of law relating to constructive trusts, which is that in order to establish such a trust the evidence must be "clear and convincing," or as stated in *Broadway Building Co.* v. *Salafia,* 47 R. I. 263, at page 267: "Evidence upon which to erect such trusts is subject to the closest scrutiny and proof must be clear, full and satisfactory." *Hudson* v. *White,* 17 R. I. 519; *Industrial Trust Co.* v. *Colt,* 46 R. I. 319; *Rosati* v. *Rossi,* 47 R. I. 493; *Oldham* v. *Oldham,* 58 R. I. 268; *Larocque* v. *Larocque,* 74 R. I. 72, and cases cited. The many cases from other jurisdictions upon which complainants rely are inapplicable either because they are distinguishable in their facts from the instant cause, or the law therein applied differs from the well-settled law of this state. The decision of the trial justice in the present cause is clearly based on our law governing constructive trusts.

No one incident in the dealings between the parties is in itself sufficient to control the decision on the merits of this cause. We have tried to indicate that the conflicting evidence reveals a series of interrelated and almost inextricably connected occurrences. To decide the fundamental question at issue it was therefore necessary for the trial justice to weigh the evidence as a whole and not piecemeal; to draw reasonable inferences therefrom; to consider the probabilities; and to pass upon the credibility of the witnesses. In our judgment his decision shows that he performed his duty with care following a trial in which the parties were given every opportunity fully to present their respective claims.

By a long line of decisions, one of the latest among which is *Caton* v. *Caton,* 74 R. I. 208, it is firmly established that where the evidence is conflicting the findings of fact by the trial justice in an equity cause are entitled to great weight and will not be set aside unless they clearly fail to do justice between the parties. The trial justice had the advantage

of seeing and hearing the witnesses, a matter of great importance and assistance in appraising the credibility of the testimony in this cause. The conflicting evidence as to the existence of a fiduciary relationship between Grant and the Rookes was open to different and opposite conclusions. The trial justice decided that upon all the evidence the complainants had failed to establish such relationship in their favor by the quantum of proof required in this class of cases. From our examination of the evidence we cannot say that his decision was clearly wrong.

Complainants' third and seventh reasons of appeal are substantially to the same effect. Their basic contention under them is that the trial justice allowed in evidence over objection letters and parol evidence of alleged agreements not incorporated in the written agreement of September 23, 1936, which evidence tended to vary and nullify said written agreement. In our opinion such reasons of appeal are not properly before us. While they refer to alleged erroneous rulings of the trial justice during the trial, they do so only in general and vague language and do not set out each specific ruling complained of. In other words they fail to particularize each alleged erroneous ruling as required by the decisions of this court. A similar situation was considered in *Nelson* v. *Dodge*, 76 R. I. 1, and we there held that under our appellate practice in equity reasons of appeal which allege generally that the final decree is against the law, the evidence and the weight thereof are sufficient; but to bring up for review alleged error in any special order or ruling made *during* the trial, separate reasons of appeal specifying each alleged erroneous action must appear in the reasons of appeal. *Vaill* v. *McPhail*, 34 R. I. 361, Ann. Cas. 1914 D, 516.

Under another reason of appeal complainants contend that assuming Grant had the right to retain the profit from the claims against Money Meters purchased by him, the trial justice erred in failing to distinguish between that right and his right to retain the claim of Walter A. William-

son against Money Meters, which claim was allegedly turned over to Grant on his promise to reorganize the corporation "after that reorganization had been abandoned by Grant." The quoted language is not in accordance with the evidence.

We have already stated in our brief summary of the facts that Grant, before deciding to involve himself in the tangled affairs of Money Meters, asked for and the Rookes promised to give him an accurate list of the creditors of that corporation. Upon discovery that the Williamson claim had been omitted from the list Grant refused to go further in the matter until that claim, which was in a considerable amount, was assigned to him. When this was done Grant continued his efforts to save Money Meters until he learned that another undisclosed creditor, Nichols and Hammond, had brought or threatened to bring suit on a claim against Money Meters and that the charter of the corporation had been forfeited for nonpayment of taxes. The contention under consideration further assumes that Williamson was a party to these proceedings in the instant cause, whereas he was not, and it overlooks evidence in the present record that he brought an action at law in the superior court in his own right against Grant respecting the assignment in question.

We have considered the remaining reasons of appeal but the only one that we deem necessary to discuss is that the trial justice should not have dismissed the bill of complaint without allowing an accounting between Grant and the complainants for the purpose of releasing the stock of the Leonard Valve Company and other collateral held by Grant in connection with certain *personal* loans to the Rookes. Such issue was not involved in this cause. We recall here that the Rookes brought the present bill on behalf of themselves and other stockholders of Money Meters who might join as complainants. The suit is therefore in substance and effect a stockholders' bill. Thus viewed, matters concerning the personal dealings between the Rookes and

Grant unconnected with the affairs of Money Meters were clearly beyond the scope of the bill.

There is also testimony from Grant to the effect that he has always been and is now ready and willing to give the Rookes an accounting of their personal indebtedness to him, which includes the debt secured by the above-mentioned stock and other collateral. In the circumstances it is clear that all personal matters remaining unsettled between the Rookes and Grant, including such agents or agencies of the latter as may be involved therein, are not closed by our decision in this cause, and that in such matters the Rookes are free to proceed with reference thereto as they may be advised.

The complainants' appeal is denied and dismissed, the decree appealed from is affirmed, and the cause is remanded to the superior court for further proceedings.

*Knauer & Knauer, Philip S. Knauer, John R. Ferguson, Marshall Marcus, Philip S. Knauer, Jr.,* for complainants.

*Swan, Keeney & Smith, Eugene J. Phillips, Marshall Swan, Samson Nathanson,* for respondents.