DECISION I. FINDINGS OF FACT
This is an action by the plaintiff to impose a constructive trust on certain fees collected by the defendant as the lawyer for certain personal injury claimants. Each party claims to be entitled to some or all of the fees. The Court finds the following facts to be undisputed or to have been proved by clear and convincing evidence. To the extent the Court has not made a finding of fact requested by the plaintiff or the defendant pursuant to Rule 52, the Court finds that fact not to have been proved by clear and convincing evidence.
Wistow Barylick, Inc. ("WB") is a Providence law firm which concentrates on civil litigation involving personal injury claims. At the material time, WB had three shareholders and four employed associates. The defendant, Kevin F. Bowen ("Bowen"), was employed as an associate by WB on January 31, 1994 at an annual salary of $50,000. His employment was at will and the terms of his employment were entirely oral. It was understood that the defendant could expect an annual bonus at the discretion of the plaintiff. It was also understood that any fees earned on cases brought to the firm, or originated by Bowen during his employment would belong to the firm, and would form no basis for the annual bonus.
Before he was employed by WB, Bowen had been employed as an associate at the law firm of Brian Cunha Associates. After he jointed WB, Bowen continued to represent five clients who had previously been represented by Brian Cunha Associates. Disputes regarding the allocation of fees in those cases are not before the Court. The Court finds that the circumstances of the defendant's departure from Brian Cunha Associates are not admissible under Rule 404(a) to test the defendant's credibility and do not constitute clear and convincing evidence of any material state of the defendant's mind under Rule 404(b) of the Rules of Evidence. During his employment at WB, Bowen was retained by two sets of clients, Sara Reuter and the White family, Theodore and Maryann White and their minor children ("White" or "the Whites", respectively). Any fee disagreement in the Reuter case is also not before the Court.
Although Bowen never openly expressed any dissatisfaction with his employment at WB before he departed, he became "disenchanted" after some three or four months. He believed that the firm was dominated by its principal, Max Wistow ("Wistow") and that he would never achieve equal status and could remain indefinitely subject to the risk of termination. He was also unhappy with the relationship between the shareholders, especially Wistow, and the associates. In May or June of 1994, he decided to leave the firm. In June of 1994, Bowen began to prepare for his departure. He acquired office furniture. He discussed office space and a business relationship with Stephen Breggia, a lawyer with offices in Providence. For personal and family reasons Bowen had not yet at that time decided on a particular date for his final separation from WB.
On July 29, 1994, the Whites were en route to Sesame Street Village in Pennsylvania. They were accompanied in another vehicle by Beryl Borden ("Beryl") and her husband and their three minor children. Mary Rogers ("Rogers") was then Bowen's fiancie, now his wife, and the two then lived together. Beryl is Roger's sister. Beryl and Maryann White had been best friends since high school. Through Beryl, Bowen and Rogers became friends with the Whites, socializing with them at various events and family gatherings. The Whites had sought legal advice from Bowen or Rogers on three separate occasions prior to July 29, 1994.
The Whites' motor vehicle was struck from behind by a tractor-trailer on Interstate Route 95 in Connecticut. Theodore White was severely injured and was evacuated to Yale-New Haven Hospital in New Haven, Connecticut. Other members of the White family sustained less serious injuries. Bowen learned about the accident from a telephone call from Beryl at l:00 a.m. on Saturday, July 30, 1994. Bowen and Rogers traveled to Connecticut to be of assistance to the Whites that Saturday and the following Sunday, July 31, as well as on Monday, August 1, 1994. Bowen did not regard himself as the Whites' lawyer at first during these visits. Rather, he considered himself then to be acting as a family friend.
On July 31, Bowen called Wistow on the telephone and briefed him on the "rudimentary" facts of the accident. At that time Theodore White was in the intensive care unit at Yale-New Haven Hospital and Maryann White was in some other hospital. Although they entered into no formal written or oral retainer agreement, it was clearly understood that Bowen would represent the Whites in their personal injury claims. On his August 1 trip to Connecticut, he photographed the scene of the accident.
On August 2, Bowen conferred with Wistow and briefed him more fully about the case. Another shareholder in the firm, Stephen Sheehan, assisted Bowen in retaining an accident reconstruction expert. Although Wistow swore at trial that he told Bowen on this occasion he wanted to meet the Whites personally, his memory of the events of August 2 is not reliable. Although it may well be that he did want to meet the clients eventually, it is, nevertheless, doubtful at best that he communicated that desire at that brief conference. Bowen immediately began the routine preliminary steps in the preparation of a personal injury claim. At this time, Bowen was clearly acting as an agent of WB.
Theodore White was not released from intensive care until around August 10. Around August 15, Bowen discussed a fee arrangement with Theodore White. Previously, Bowen had advised Wistow that Theodore White had been released from intensive care and that he would then negotiate a fee agreement with White. Wistow did not ask to see the Whites on this occasion. Bowen did mention a contingent fee of forty percent to White, although forty percent was not the customary charge at WB. White had already understood from a conversation with his employer that he could hire a lawyer to represent him and his family for a contingent fee of twenty percent. At this time, Bowen felt comfortable representing the White, although no formal written fee agreement had yet been executed.
Bowen and Wistow met with representatives of the personal injury defendant and its insurer on August 18. As a result of that conference, both Bowen and Wistow believed that the defendants regarded liability to be clear. They also learned that there was $12 million of liability insurance coverage. Bowen then believed that the claim had a value of between $5 and $6 million. Following that meeting, Wistow authorized Bowen to agree to a fee of less than one-third and suggested twenty-five percent.
On August 29, Theodore White executed a fee agreement at twenty-five percent. No formal fee agreement regarding the claims of Maryann White and the minor children was executed, but it was clearly understood by Bowen and the Whites that WB represented all of the White family. White agreed to pay the additional five percent in order to get Bowen to represent him. Neither Bowen nor WB were aware in 1994 that contingent fees in Connecticut were regulated by statute. Although Bowen extolled the skill and reputation of WB in personal injury claims to the Whites, the reputation, skill and resources of WB played no part in their decision to retain Bowen's firm. When they originally retained him immediately following the accident they actually believed he was still associated with Brian Cunha Associates.
Wistow testified that he spoke to Bowen "at least half a dozen times" between August 17 and October 17 about meeting with the Whites. He acknowledged that Bowen "invariably agreed" to arrange a meeting. So far as meeting personally with all clients was concerned, Wistow testified that there was no firm policy. Each case stood "on its own feet." Bowen could recall only a couple of occasions on which Wistow specifically requested a meeting with the Whites. Immediately following the August 18 meeting, Wistow expressed a desire to meet the Whites sometime in the future. He conveyed no sense of urgency to Bowen. On another occasion in September, Wistow again told Bowen he would like to visit the Whites and Bowen said, "Sure."
During the month of September, Bowen decided to leave WB at the end of October. In early October, at Wistow's suggestion, the two of them agreed to meet with the Whites during the week of October 12. Wistow made a record of the date in his pocket diary which he discarded some time early in 1995 after this action was commenced. Later, at Wistow's request the date was postponed to October 18. Meanwhile, during the week of October 10, Bowen firmed up his preparations to leave the WB firm. He began to prepare transfer memos on cases he had been handling for WB. He did not, however, prepare transfer memos on the cases he had brought to WB from Brian Cunha Associates, or had originated himself, since all of these clients were personal friends or family friends or relations. Their files, of course, remained at WB until the clients requested their transfer. He hired a secretary and arranged to begin a practice in association with Stephen Breggia and Lynn Abbott. He ordered stationery and opened professional bank accounts. He planned to give WB two weeks notice on October 17 of his departure at the end of the month.
On Thursday, October 13, while returning from a deposition in Shelton, Connecticut, Bowen dropped in for a social visit with Theodore White who was then in the Pendleton Rehabilitation Facility. Toward the end of the visit Bowen casually mentioned that he was considering leaving WB. White's response simply was, "Great!"
The evidence presents two different versions of what was plainly a tense and highly emotional encounter between Wistow and Bowen on the morning of Monday, October 17, 1994. Sifting through the emotion-impaired testimony of the witnesses the following facts emerge. Bowen notified Wistow that he was leaving. Wistow requested a meeting with the Whites. Bowen said that, although such a meeting was scheduled for the next day, the Whites were going to stay with him. Wistow lost his temper and threatened to sue Bowen. Eventually, Wistow regained his composure and suggested that Bowen reconsider his decision to leave and to make some kind of proposal by which he and the White case could remain with WB.
On October 18, 1994, Bowen returned to the firm offices and met with all of the principals in the firm. The atmosphere once again was clearly emotionally charged. No one preserved any contemporaneous record in any form of the substance of this or a later conference. Bowen re-affirmed his decision to leave. He also disclosed that he had mentioned his plan to leave to Theodore White. The members of the firm did not take the potential loss of a million dollar fee lightly. Nevertheless, Bowen agreed to consider for another night whether there was any arrangement by which he would remain with the firm. The testimony is replete with acrimonious accusations and counter-accusations. This Court concludes that what happened is more important than how the parties expressed what they felt about what was happening.
On the next morning, October 19, Bowen announced that he had not changed his mind about leaving. Whereupon John Barylick pointed out that Bowen was still an employee of the firm and directed him to set up a visit with the Whites. Bowen resigned immediately and left the WB offices at approximately 9:45 a.m. He confirmed his resignation in writing shortly thereafter.
All of the case files on which Bowen had worked remained in WB's offices, immediately and completely accessible to the principals of the firm at all material times prior to and including October 19, 1994.
That morning, after leaving the WB office and going to his future office Bowen learned that Maryann White had been attempting to reach him. Bowen returned Mrs. White's call and advised her that he had left WB. Bowen advised Mrs. White that WB wished to continue to represent the members of the White family and would do so at a reduced fee. He reminded Mrs. White that WB was a "top-flight" firm. In addition, he advised her that the Whites were free to choose their lawyer and that the principals of WB wanted to meet with her and her husband. Mrs. White responded that she and her husband regarded Bowen as their lawyer and that as to a meting with WB, she said "It's a non-issue. We don't want to meet with them. Can you take care of it for us?" Bowen took care of it for them. On the afternoon of October 19, 1994, the Whites executed a file transfer authorization and discharged WB as their lawyers.
Bowen continued to represent the Whites until their claims were settled in July 1997. Based on the Connecticut statutory fee schedule, the legal fees came to $885,000, less expenses. The net fees of $847,707.09 are being held in escrow pending the outcome of this litigation.
It is clear from the record the vast bulk of legal services to the Whites were rendered by Bowen after his departure from WB.
The plaintiffs have requested that the Court make findings regarding the quality of Bowen's legal services to the Whites after his departure. To the extent that such facts, if found to be true, would demonstrate that the Whites would have been better off remaining with WB, they are immaterial. To the extent they might, if true, reflect on Bowen's character they are irrelevant pursuant to Rule 404(a) and do not tend to prove any material state of Bowen's mind under Rule 404(b). The same is true with regard to the cases, files and memos Bowen worked on and tendered after his departure, which are referred to in the plaintiff's requests for findings under Rule 52.
Other findings of fact and inferences drawn from the facts proved by the evidence will be made as the Court analyzes the law to be applied to the facts in this case.
 II. ISSUES PRESENTED
The issues presented in this case, not yet directly addressed by our Supreme Court, are as follows: (1) Did the defendant owe any duty to the plaintiff, as its employee, with respect to its clients during and after his employment? If so, what was that duty at each of those times? (2) Did the defendant breach that duty by his conduct during and after his employment by the plaintiff? and (3) What remedy is available to the plaintiff, if the defendant did breach any duty he owed it?
 III. ANALYSIS A. The defendant's duty to the plaintiffs:
The evidence is undisputed that the defendant was employed by the plaintiffs as an associate in their law firm from January 31, 1994 and that he terminated his employment on October 19, 1994. The defendant's employment contract was oral and, since no precise period of employment had been agreed, he was an employee at will. Either party, employer and employee, was free to terminate the employment with or without cause, with or without notice. See Pacheco v. Raytheon Company, 623 A.2d 464, 465 (R.I. 1993)
It is far too late in the day to argue that the defendant had no obligation to the plaintiffs beyond doing the job for which he was hired to the best of his ability. In Long v. Atlantic PBS, Inc., 681 A.2d 249
(R.I. 1996), the Supreme Court held:
 "Moreover, absent any enforceable noncompetition agreement, former employees like Long can solicit their previous employer's customers for business, as long as, in doing so, they are not acting tortiously, for example, by interfering unjustifiably with their former employer's contracts, by misappropriating the employer's trade secrets, or by converting other confidential business information belonging to their former employer" (Citations omitted.) 681 A.2d, at 253. (Emphasis supplied.)
It is important to note, however, that in the Long case a jury verdict against Long was approved on a "breach-of-fiduciary-duty" charge concerning Long's conduct while he was an employee of the defendant. Id. at 251. To the extent that an employee acts as an agent for an employer the employee owes a fiduciary duty with respect to the subject of the agency relationship. Cahill v. Antonelli, 120 R.I. 879, 883, 390 A.2d 936, 939 (1978). Employees have been held to owe a duty of loyalty to their employers, such that solicitation of the employer's customers by the employee during the employment will constitute a clear breach of a confidential relationship. Rego Displays, Inc. v. Fournier, 119 R.I. 469, 474-75, 379 A.2d 1098, 1101 (1977).
In a case cited by both sides, the Supreme Judicial Court of Massachusetts declared that partners and associates in a law firm equally owed the law firm a fiduciary duty of loyalty to the firm by reason of their respective partnership agreement, with respect to the partners, and his employment, with respect to the employee. Meehan v. Shaughnessey,535 N.E.2d 1255, 1265 (Mass. 1989).
It is clear from the cases that during his employment the defendant was obliged to exercise complete loyalty to his employer. It would be unthinkable for him to compete against the plaintiff for the business of any of the firm's clients. The cases also uniformly condemn anypre-departure solicitation of firm clients by a departing lawyer, whether an associate or a partner.
The rules are different, however, regarding post-departure
solicitation. The Restatement (Third) of the Law Governing Lawyers,
§ 9(3) provides:
 "Absent an agreement with the firm providing a more permissive rule, a lawyer leaving a law firm may solicit firm clients:
 (a) prior to leaving the firm:
 (i) only with respect to firm clients on whose matters the lawyer is actively and substantially working; and
 (ii) only after the lawyer has adequately and timely informed the firm of the lawyer's intent to contact firm clients for that purpose; and
 (b) after ceasing employment in the firm, to the same extent as any other nonfirm lawyer." (Emphasis supplied.)
Section 9(3) of the Restatement is a fair and reasonable resolution to the problems arising out of the mobility of lawyers in current practice. Lawyers seem to move from firm to firm with some regularity, as existing firms merge and dissolve with increasing frequency. In addition, it is entirely appropriate to regard client loyalty to a particular lawyer as at least equal to the lawyer's loyalty to a firm, whether as partner or associate.
In the Restatement formulation, the departing lawyer has a duty with regard to soliciting firm clients which varies according to the pre- and post-departure status of the lawyer. Pre-departure the lawyer has a limited permission to solicit the business of firm clients. Post-departure the only limits on the permission are those which would apply to a nonfirm lawyer. A nonfirm lawyer may not, of course, tortiously interfere with the firm's prospective business relations with its clients. Nor may such a lawyer engage in defamatory or disparaging conduct to woo clients from the law firm. Finally, such a lawyer could not take advantage of unlawfully obtained confidential information regarding the client.
B. The question of breach of duty by the defendant:
The plaintiff argues that the defendant breached his duty to it during
his employment in a number of respects. First, he concealed his plans to leave the firm and take the White case without timely and adequate notice. Second, he disparaged the plaintiff when negotiating a fee agreement with the Whites. Third, he refused to allow Max Wistow, a principal of the firm, to attempt to establish a professional relationship with the Whites by refusing to schedule an appointment for him to meet the clients. Fourth, he solicited the business of the Whites without timely and adequate notice to it to permit it to compete fairly.
In Meehan v. Shaughnessey, supra, it was held that the departing partners were not required to give the firm any prior notice of their departure except as agreed in the partnership agreement. Furthermore, it was held that their secret preparations to depart and establish their own firm was not a breach of the fiduciary duty of the partners to the partnership. Since the defendant was an employee at will, he was subject to discharge by the plaintiff without notice and without cause. His secret preparations to leave his firm by the same token were not acts of employee disloyalty.
Both the defendant and Theodore White, himself, agree that, when they were negotiating a contingent fee, the defendant mentioned a forty percent figure. At the time, however, White had been advised by a former employer that he could obtain competent representation for a contingent fee of twenty percent. Eventually, according to White, he agreed to twenty-five percent, five percent more than he felt he had to pay, just to get the defendant to represent him. It is inconceivable that the defendant would deliberately disparage his law firm when he was trying to get a client to enter into a fee agreement with the firm. The Court is impressed that the defendant did not extol his own ability and experience but expanded on the resources and experience of the plaintiffs, even showing White a settlement brochure prepared by the firm in another case. Even though the defendant by this time had decided to leave the firm at some future date according to his testimony, he would not have done anything to discourage White from engaging the plaintiff. At worst, the defendant's mention of a forty percent fee was a bargaining ploy to elicit more than twenty percent from the client, or to justify as a bargain the one-third fee he was then requesting.
The plaintiff stresses the argument that the defendant successfully averted a person-to-person meeting between the Whites and Wistow, a personal injury claims attorney of renowned skill and experience. The record, however, satisfies this Court that Wistow's requests for a meeting with these clients were casual, occasional, informal and not definite or insistent. He agreed that the defendant never refused to schedule a meeting as he requested, at least until after the defendant left the firm. The Court accepts the defendant's evidence that the defendant had scheduled such a meeting for October 12, but that Wistow had postponed the meeting until October 18. Wistow testified that he destroyed his pocket diary sometime during 1995. This suit was commenced in 1994. The fact that Wistow did not take any initiative to confer with this client without the participation of the defendant illustrates his recognition of the strength of the defendant's personal relationship to the client. His testimony was that it would have been "unseemly" for him to meet with the Whites without the defendant. The Court rejects the plaintiff's argument that the defendant's failure to arrange the meeting was part of a scheme to lure the Whites away from the plaintiff.
The Court concludes that, until the defendant gave notice on October 17 of his intent to leave the firm and that he expected that the Whites would become his clients, the plaintiff had never emphasized to the defendant that establishing a direct relation between White and Wistow was a matter of any urgent importance. This Court is satisfied that, when Wistow finally asked the defendant to set up a definite appointment, it had been done. The Court is further satisfied from the Whites' testimony that nothing any member of the plaintiff's firm could have said or done at any such meeting at that or any other time would have dissuaded them from staying with the defendant as their lawyer, in or out of the firm. Only after the defendant gave notice did the plaintiff attach any importance to its failure to have established direct contact with Whites, whether or not it would have been availing in retaining them as clients.
The Court recognizes that Wistow did feel that he should get to meet these important clients before too much time elapsed and that there was more than one time when he undoubtedly meant to mention his wishes to the defendant. This Court is satisfied, however, that he never communicated any such sense of urgency to the defendant, nor that his requests were as frequent as he believes them to have been. The Court is also satisfied that the defendant was not deliberately attempting to avoid any contact between Wistow and the Whites. Given the heightened tension between the parties in the October 17th thru 19th period and its later spill-over into this litigation, the Court can well understand how the plaintiff has come to believe that Wistow's failure to meet with the Whites was some part of a devious scheme by the defendant to steal their fee. The Court is satisfied, however, that the failure was due to mutual inertia rather than any improper motivation by the defendant. That inertia is not altogether unfamiliar to busy trial lawyers, who must carefully prioritize the demands on their professional time.
Both the defendant and Mr. White testified that the defendant spoke to Mr. White on October 13, 1994, while the defendant was still employed by the plaintiff law firm, at a health facility in Mystic, Connecticut. According to the defendant, he was returning to Providence from a deposition in Shelton, Connecticut when he stopped off to see the client, who was then still flat on his back in the rehabilitation facility. The meeting had not been pre-arranged. The defendant up-dated Mr. White on the case. Then he told the client that he was considering leaving the plaintiff law firm. He also said that he would soon be talking to his employers, and that they would talk more about that later. He testified that he brought their conversation to a quick termination, and never asked Mr. White to be his client. According to the defendant, the client's reaction was "encouraging."
The client, Mr. Theodore "Ted" White testified that in October 1994 the defendant, "Kevin," told him that he would be "off on his own." He testified that he knew that "Kevin was thinking about it." His reaction was, "Great!" Two or three days later he found out that Kevin had left WB. On that occasion he says he had decided on "Kevin" and didn't want to talk to Wistow and didn't care if Wistow offered to reduce his fee.
Describing the conversation between Ted and Kevin on October 13, 1994 as a "solicitation" is word abuse in the first degree. The defendant never "solicited" Theodore White's legal business. He didn't have any reason to. The relationship was a personal one, in which the plaintiff had no part. The Court concludes that the evidence considered as a whole cannot be found to prove at all that the defendant solicited these clients during his employment.
Considering all of this analysis of the evidence in this case the Court concludes that the defendant breached no duty he owed the plaintiffs by any of his activity during his employment. He had a right as a matter of law to prepare to depart from the firm without disclosure. He had a right to depart without notice. He was under no affirmative duty to introduce the clients to any other member of the firm and he disobeyed no request or order to arrange any meeting. He did not solicit the Whites' business. He did not disparage the plaintiff.
The inquiry does not end with an examination of the defendant's pre-departure conduct. He was not entirely free to obtain the clients' legal business after his departure. The defendant surely cannot argue that he did not agree to perform legal services for the White family immediately after his departure from the firm on October 19, 1994. The question under the Long case and the Restatement is whether or not the defendant was guilty of a tort in obtaining the clients' legal business for himself on October 19, 1994. Did he interfere unjustifiably with the plaintiffs' contractual relationship with the clients? Did he misappropriate trade secrets or convert confidential information to his own use? See Long, supra.
This Court finds the Opinion of the Supreme Court of Pennsylvania inAdler, Barish, Daniels, Levin and Kreskoff v. Epstein, 393 A.2d 1175
(Pa. 1978) to be instructive on the issue of the propriety of the defendant's post-departure conduct. In that case the plaintiff law firm sought and obtained injunctive relief prohibiting formerly employed associates from "contacting or communicating" with former clients of the firm. Prior to departing from the plaintiff law firm to organize their own firm the defendants compiled a list of 83 of the plaintiffs' cases which they were servicing as "security" for financing their new firm. One of the defendants engaged in an active campaign to procure business for his new law firm. He initiated contacts, by phone and in person, with clients of the plaintiffs with open cases on which he had worked while asalaried employee. His efforts did not stop with those contacts. He mailed form letters to clients which they could use to discharge the plaintiffs and retain the defendants. The activity of the defendants is described in the Opinion as "a concentrated attempt to procure the cases which had been used to obtain credit." The trial court found that the defendants had "tortiously interfered with the contractual and business relations that exist between [the plaintiffs] and its clients." The Court overturned a reversal by an intermediate appellate court and reinstated the final decree of the trial court.
The Court analyzed the case in the light of Section 766 of theRestatement of Torts (Second). It found that the sole dispute was whether the defendants' conduct was "improper," since it was clear to that Court that the defendants intended to interfere with the plaintiffs' contracts with its clients. The Court was guided by § 767 of the Restatement(Second) in focusing on the factors to be considered in determining whether conduct is improper. In that regard the Court held:
 "It is true that, upon termination of their employment relationship with Adler, Barish, appellees were free to engage in their own business venture. (Citations omitted.) But appellees' right to pursue their own business interests is not absolute. `[unless] otherwise agreed, after the termination of the agency, the agent . . . has a duty to the principal not to take advantage of a still subsisting confidential relation created during the prior agency relation.' Restatement (Second) of Agency, supra at § 396(d).
 "Appellees' contacts were possible because Adler Barish partners trusted appellees with the high responsibility of developing its clients' cases. From this position of trust and responsibility, appellees were able to gain knowledge of the details, and status of each case to which appellees had been assigned. In the atmosphere surrounding appellees departure, appellees contacts unduly suggested a course of action for Adler Barish clients and unfairly prejudiced Adler Barish." 393 A.2d, at p. 1185. (Emphasis supplied.)
Our Supreme Court has affixed its imprimatur on §§ 766 and 767 of the Restatement (Second) of Torts. Belliveau Building Corporation v.O'Coin, 763 A.2d 622, 627-29 (R.I. 2000). The plaintiff in this case, however, does not seek damages at law for tortious interference with its contractual relations with the Whites. Nor does the plaintiff seek to enjoin the defendant's conduct as a continuing tort. Rather, it seeks relief for the breach of a fiduciary duty, which could only be granted in this case, if that duty survived the defendant's departure from the law firm.
In this case, unlike the Adler Barish case, the defendant's contacts with the client were not at all made possible by his employment, but were virtually inevitable for reasons having nothing to do with the defendant's employment by the plaintiff. The defendant gained his knowledge of the details and status of this client's case utterly independent of any position of trust and responsibility he had in the plaintiff's firm. In no way can anything the defendant did with respect to the White family following his departure from the firm have unduly suggested a course of action for them. Their course of action was predetermined by their personal relationship with the defendant. WB was not unfairly prejudiced by anything the defendant did. Since it never would have retained the Whites, it was not prejudiced at all, let alone unfairly, by the defendant's accepting the Whites' request that he represent them.
Accordingly, the Court finds, based on its careful consideration of all the evidence and drawing such inferences as it finds reasonable, that the defendant did not breach any duty he owed to the plaintiff when he represented the Whites in their claims for personal injuries, after his departure from the plaintiff's firm. The Court further finds that the defendant's accepting the Whites as his own clients after he left his employment with the plaintiff was not the cause of any loss to the plaintiff.
C. The remedies available to the plaintiff:
The plaintiff seeks to impose a constructive trust on the funds which represent the fee earned by the defendant for his representation of the Whites. A constructive trust is not really a trust at all. It is a means by which property wrongfully taken by one person from another may be restored to the one to whom it rightfully belongs. It is a form of remedy for wrong-doing, for which compensatory damages are not adequate.
 "The familiar case of a constructive trust based on constructive fraud is found where `One who occupies a fiduciary or confidential relation to another in respect to business or property, and who by the use of the knowledge he obtains through that relation, or by the betrayal of the confidence reposed in him under it, acquires a title or interest in the subject-matter of the transaction antagonistic to that of his correlate.' 39 Cyc. 182." State Lumber Company, Inc. v. Cuddigan, 51 R.I. 69, 71-72 (1930).
Furthermore, the evidence to establish a constructive trust must be clear and convincing. Rooke v. Grant, 77 R.I. 447.
In this case "the subject matter of the transaction" was the right to collect a fee which had not yet been earned by any of the parties. At the time the Whites chose the defendant as their sole counsel, the plaintiff's services to the Whites had been relatively insignificant, involving only a few hours of the defendant's time and some short attention by the plaintiff. The real work in the case lay in the future after the defendant had departed from the firm. The plaintiff cannot justly claim to have earned more than a tiny share of the fee paid by the Whites, yet it seeks through the office of a constructive trust to secure all of it, as if the fee actually paid was somehow its property, which the defendant wrongfully took from it.
The plaintiff deliberately chose to forego any claim for damages for intentional interference with its contractual relation with the Whites or its prospective interests in the profits its relationship with the Whites might have produced. Instead, it seeks to impose an "all or nothing" remedy on the defendant. The relief it seeks, based on their argument to the Court, is more like punitive damages than a fair restoration of a property interest acquired by the defendant through a constructive fraud.See Plaintiff's Post-trial Memorandum, January 22, 2002, p. 22 (acknowledging that they are seeking a forfeiture). To allow the plaintiff the remedy it seeks would be to allow these attorneys a fee they did not earn.
The plaintiff insists that its claim in no way implicates any right of the Whites to be represented by a lawyer of their choice. Nevertheless, according to their argument if they choose the defendant, he must serve without earning a fee. This Court does not recognize such a choice as a real choice. It appears to this Court that the plaintiff is seeking to apply a per se rule: If a departing employed lawyer represents a former firm client in a matter pending at the time of the lawyer's departure, the lawyer will forfeit any fee received from that client to the lawyer's former employers. This Court declines to apply such a Draconian postulate.
If the defendant could be liable to the plaintiff for any breach of duty, the defendant should be compelled only to compensate the plaintiff for any loss resulting from that breach. In this case, there was no loss at all.
It may be that the plaintiff in an appropriate claim would have been entitled to be compensated for the services rendered by the defendant to the Whites, while the defendant was employed by the plaintiff, and to be reimbursed for expenses incurred by the plaintiff during that period. Although such a claim could have been made in this case originally, as an alternative to the specific relief sought, or at any time during this litigation, the plaintiff has specifically declined to assert such a claim. Although the Court may grant any relief, which the law accords to a claimant based on the facts proved at trial, the Court cannot invent a claim. In addition, the Court has no evidence upon which to base any award to the plaintiff for the value of the legal services rendered and the costs or expenses incurred by it at as lawyers for the Whites, even if such a claim were to be implied from the evidence presented at trial.
 IV. CONCLUSION
Since the Court finds that the defendant did not breach any fiduciary duty he owed to the plaintiff, the plaintiff's complaint will be denied and dismissed.
The parties will agree on a form of judgment for entry in accordance with this Decision.